Farrell, to use, *v.* H. Platt Company et al., Appellants.

Argued April 12, 1940. 

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and
HIRT, JJ.

Leo H. McKay, with him C. E. Brockway, of Brock-
way, Whitla & McKay and S. A. Sisson, for appellants.

T. A. Sampson, of Stranahan & Sampson, with him
Benjamin Marks and E. C. Moon, for appellees.

OPINION BY CUNNINGHAM, J., October 11, 1940:

On March 12, 1936, the City of Farrell entered into a contract with H. Platt Company, appellant at No. 204 April Term, 1940, and hereinafter referred to as Platt, for the construction of a Sewage Treatment Plant and Raw Sewage Pump Station—including, inter alia, the construction of six buildings and the laying of sewers along Spearman Avenue and other city streets. Seaboard Surety Company, appellant at No. 205, became the surety upon Platt's performance and "labor and materialmen's bond."

The "Contractor's Bidding Sheet" attached to the contract contained more than a hundred items, arranged under various headings indicative of the component parts of the system, such as "Outside Piping," "Control House," "Sewers and Discharge Mains," etc. The sheet also contained columns headed "Estimated Quantity," "Unit Price Bid," and "Total Price Bid." We are concerned in this case chiefly with the portion of the sheet reading:

"SEWERS AND DISCHARGE MAINS

92. Earth Excavation, including cutting and replacing of street pave

93. Rock Excavation, including cutting and replacing of street pave

94. Black Steel Pipe, 12″

95. Black Steel Pipe, 10″

96. Vitrified Pipe, 18″

97. Vitrified Pipe, 12″

98. Vitrified Pipe, 8″ "

In general, the unit price bid by Platt to the city for "earth excavation" was $1.50 per cu. yd. and $5 per cu. yd. for "rock excavation."

On June 15, 1936, Platt entered into a subcontract with C. W. Milarr, Inc., (hereinafter referred to as Milarr) use plaintiff below and appellee herein, wherein the latter undertook to "furnish all materials......and fully construct, perform and in every respect com-

plete all the Excavation, Backfilling, Tamping pipe and fittings (Items # . . . . . . 92, 93, 94, 95, 96, 97, 98 . . . . . . ) ; For the Sewage Treatment Plant . . . . . . and Sewers, according to the plans and specifications (details thereof to be furnished as needed) of Robert Hall Craig, Engineer, and to the full satisfaction of said Engineer."

Seventeen additional item numbers were included in the above indicated parenthesis covering earth and rock excavations, various kinds of pipe and pipe fittings. Other material provisions of the subcontract read:

"In consideration whereof, the said contractor agrees that he will pay to the said subcontractor in monthly payments, the sum of 75c per cu. yd. for excavation, 25¢ per lin. ft. for laying pipe, $4 per cu. yd. for rock as shown and called for, any additional rock at $3.50 per cu. yd. for said materials and work, . . . . . .

\* \* \* \* \*

"Unit price for excavation includes *backfilling* and *tamping*." (Italics supplied.)

In general the terms of payment to Milarr were 90% of the amount due for labor and materials as construction "was placed in position," upon presentation of bill to Platt, and balance upon completion of work and approval by engineer.

Milarr began the work covered by his subcontract within four days after its execution and continued until August 28th when he suspended operations because, as he alleged, the necessary engineering lines had not been run, required shoring material had not been furnished, and the lines of various public utilities had not been removed. On September 11th Milarr applied to Platt for payment for the work done in August. By that date the above complaints had been adjusted and Harold A. Cook, Platt's representative, agreed to get a check for Milarr within a few days.

On September 14th Milarr resumed his work and continued until noon of the day following when he was

informed by Platt nothing more would be paid him as Platt claimed Milarr had already been overpaid. The city had paid Platt on September 3d for the work performed by Milarr during the month of August.

Milarr thereupon rescinded his subcontract with Platt by a letter to the latter reading: "This is to advise you that we have this day at 12 noon discontinued our operations on our subcontract at your sewerage disposal plant job at Farrell, Pa. This action is taken because of your failure to pay our current estimate as covered in our contract article #14."

The reference is to the above quoted provision of the subcontract relative to monthly payments.

On August 27, 1937, Milarr brought his action in assumpsit, as a use plaintiff under the bond of the general contractor to the city, against Platt and the surety thereon, claiming a balance due him of $1955.06 for so much of the work as he had performed under the subcontract, with interest from September 15, 1936.

The surety defended upon the ground that Platt "did not owe the use plaintiff any amount whatever." Platt, in addition to denying he owed Milarr anything, presented a counter-claim in the amount of $4377.49, including an item of $2053, representing the sum he had been obliged to pay other persons for doing the unperformed portion of the work covered by Milarr's contract over and above the amount "[he] would have been required to pay for the same work and materials if the use plaintiff had completed the same under the subcontract."

The result of a trial by the court without a jury was a decision by Rowley, P. J., on October 28, 1939, that Platt's counter-claim was without merit and the entering of a judgment in favor of Milarr and against both defendants in the principal sum of $1589.19, with interest from September 15, 1936, or a total of $1886.37. The principal sum is composed of two items—$1131.06 as the balance due Milarr for the work performed by

him under the contract and $458.13 for extras. These appeals by the respective defendants followed.

As we view the case, the first and most important question of law involved upon these appeals is whether or not the court below erred in its seventh conclusion of law reading: "C. W. Milarr, Inc. was not bound by the terms of the subcontract to replace the pavement on Spearman Avenue."

This conclusion must be read in connection with the nineteenth finding of fact, viz: "In performing its work, Milarr necessarily removed 800 feet of the pavement upon Spearman Avenue. The cost of replacement of this pavement was $1555.40."

When this amount is compared with the principal sum of the judgment in his favor it is clear that, if Milarr was legally bound under the terms of his subcontract to replace this pavement, Platt owed him nothing on September 15, 1936, and Milarr breached his contract by abandoning the work on that date. Assuming all the other findings in Milarr's favor to be correct, the 90% of the above mentioned $1131.06 then due would be only $1017.95, or plus the $458.13 for extras, only $1476.08. We accordingly take up that issue first.

Upon the question of law thus arising—the interpretation of the writings involved—we adopt these excerpts from the discussion of the court below:

"But defendant says Milarr was chargeable with replacement of the Spearman Ave. pavement at a cost of $1555.40. This claim by the defendant is based upon the fact that the contract between H. Platt Company and Milarr refers, among others, to item 92 on the Contractor's Bidding Sheet. That item reads, '92. Earth excavation, including cutting and replacing of street pave.'

"Defendant points out also that the subcontract provides that the subcontractor shall perform and com-

plete the work 'according to the plans and specifications of Robert Hall Craig, engineer.'

"The specifications as prepared by Robert Hall Craig appropriately undertook (in the proposed contract between the city and the general contractor) to define earth excavating, and by its definition included therein replacement of street pavement. It would have been equally proper for H. Platt Company in contracting with Milarr to have specified that the term 'excavation' should include replacement of street pavement, or by use only of the term 'excavation' it might have imposed upon Milarr the duty of referring to the bidding sheet to ascertain what was included in the term 'excavation.' But the H. Platt Company did neither, instead it specifically provided in the subcontract that Milarr should perform 'the excavation, backfilling, tamping pipe and fittings.'

"Following the above quotation in the subcontract there is inclosed in parenthesis the numbered pertinent items of the bidding sheet. It would seem apparent, especially to a contractor, that the cost of repavement of the excavated trench, of the dimensions here involved, would far exceed the compensation for excavation. Of course, the fact that one undertook to perform work for grossly insufficient compensation is not reason to excuse him from performance. But it is not to be assumed that the parties here particularly specified the lesser details of the work (backfilling, tamping and attaching pipe fittings), but relied upon inference or broad generalities for description of the major item, (repaving).

"Under no fair interpretation of the subcontract can it be held that Milarr undertook to perform item 92 as described on the bidding sheet. Had it been the intention of the parties to so bind Milarr, it would have been altogether a simple matter to so state in their contract.

"The parties to the subcontract clearly set forth 'Unit price for excavation includes backfilling and tamping.'

"These words cannot be reasonably misunderstood nor can they be interpreted to signify that the unit price for excavation includes not only the incidental operations of backfilling and tamping but also the major operation of repaving.

"A general contractor frequently undertakes items knowing he must perform them at a loss on the particular items, with the expectation that other items on a more favorable basis will outweigh the disadvantage. Where, however, as here, a subcontractor undertakes to excavate at a unit price, it should not be held that he bound himself to incidentally perform, without compensation, an additional task the ordinary compensation for which exceeds that for the work expressly undertaken—unless the words of his contract clearly so imply.

"We have no difficulty in concluding that Milarr bound himself to perform excavation, backfilling and tamping pipe with respect to various items on the bidding sheet including item 92. The first part of first paragraph of the subcontract sets out the duties of the subcontractor conspicuously as excavation, backfilling, tamping pipe. The numbered items are enclosed in parenthesis for the purpose of indicating the items with respect to which the subcontractor is to excavate, backfill and tamp. If there was any doubt as to the meaning of the earlier portions of the first paragraph of the subcontract, it would be removed by the concluding lines which restate quite specifically the duties of the subcontractor in these words: 'Unit price for excavation includes backfilling and tamping. Unit price for piping per foot includes placing all fittings, valves, etc. in connection with same.'

"There is not the slightest hint in the subcontract that the excavation is to include repaving of the street.

"But defendant says the specifications of Robert Hall Craig, engineer, provide that excavations shall be repaved. Such requirement was binding upon the general contractor because it was expressly set out in the speci-

fications, but the general contractor sublet only a portion of its duties under the general contract. It could, of course, have provided that excavation should include repaving, but it did not. It did set out quite specifically what work was sublet to Milarr, detailing, for example, that the fittings and valves furnished by it should be placed in connection with the pipes. In the face of such particularized minor operations, it would not be consistent with reason to hold that the subcontract by implication bound Milarr to repave the street.

"Milarr was bound to perform such duties as he assumed in accordance with the specifications of Robert Hall Craig, but he assumed only the duties set out in the subcontract as therein defined. The general specifications of Craig did not define the *extent* of Milarr's duties but only the *manner* of performance of such duties as Milarr assumed under the subcontract."

We may add that the conclusion of the trial judge seems to be strengthened by the fact, above stated, that Platt's general unit price to the city for earth excavation was $1.50, per cu. yd., whereas he agreed to pay Milarr only 75 cents, per cu. yd. for that item.

It does not necessarily follow, however, that Platt's mere refusal on September 15th to comply with Milarr's demand for payment of the amount due him for the work performed in August was such a material breach of the subcontract as to justify its rescission forthwith.

The principles of law applicable to this branch of the case may be gathered from Restatement of the Law of Contracts, §§ 274-280 and the comments thereon. Section 274 is entitled, "Failure of Consideration as a Discharge of Duty." Here the parties had entered into a contract for the exchange of the performance of certain construction work for money. Each performed his contract for the construction work done during the months of June and July and Platt paid Milarr $2,-142.69 for those months. Milarr continued with the work up to August 28th when, as above stated, he

suspended operations because of the delay in the running of engineering lines, the furnishing of material, and the removal of the lines of certain public utilities. No part of the money due him for his work in the month of August was paid. As expressed in Section 274, "any material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange......" In Section 275, sub-paragraphs (e) and (f), two of the rules for determining the materiality of a failure fully to perform a promise are thus expressed: "(e) The wilful, negligent or innocent behavior of the party failing to perform; (f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract." In our opinion none of the other four rules laid down under the section is here applicable.

Here, there can be no question that the failure of Platt to pay any amount whatever for the work concededly done by Milarr during August was wilful and it is equally clear that Platt made it perfectly certain that he did not intend to pay anything even on account of this work. His position was that Milarr had already been overpaid. As stated in Comment d. Section 274, a promisor is wholly discharged from his duty to perform as soon as the actual or prospective failure of the other party shows that substantial performance of the agreed exchange will not be received. Here Milarr was put in a position not only of one who had not received anything for the work he had done in August, but also in the position of one who evidently was not going to receive the exchange promised him for his own performance.

Comment (a) upon Section 280 is also applicable. It is there stated that even where the failure of consideration is only prospective, a statement by the other promisor that he will not perform his duty discharges the other party. It is also there stated that "what amounts to such a statement is a question of fact."

As a general proposition, the question whether or not a failure to make stipulated payments justifies the rescission of a contract is dependent upon the surrounding circumstances as found by a jury or other fact-finding tribunal: *Easton v. Jones,* 193 Pa. 147, 44 A. 264; *Worden v. Connell,* 196 Pa. 281, 46 A. 298; *U. S. Fidelity and Guaranty Co. v. Grace Contracting Co.,* 263 Fed. 283; and *Young Construction Co. v. Road Improvement District No. 2,* 297 Fed. 127.

In the present case the parties stipulated that the trial judge should be the fact-finder. Upon the issue now before us he made findings to the effect that a reasonable period elapsed between August 31st and the date of Milarr's final withdrawal (September 15) for computation and payment by Platt of the amount due Milarr for work performed in August; that on the same day Platt wrote Milarr proposing to pay him a bonus and an additional amount for excavation of sewers below a given depth, provided Milarr resumed work on September 14th; that Milarr did resume work on that date and continued until noon on September 15th, at which time Platt expressly refused to make any payment to Milarr and assigned as the sole reason for such refusal that nothing was due him.

Under the facts and circumstances thus found by the trial judge, supported as they are by the evidence, we think Milarr was justified in rescinding the subcontract and withdrawing as he did from the work.

The only other feature of the case requiring comment is the contention on behalf of appellants that Platt had a further justification in refusing to pay Milarr for his August work in that the latter had neglected to furnish a bond as provided in the subcontract for its faithful performance. The court below made no conclusion of law upon this contention because, as stated in its discussion, it deemed it unnecessary to determine whether the giving of the bond was waived, as asserted by Milarr.

The tenth finding of fact was that Platt by a letter

of June 24, 1936, agreed to pay for this bond and on July 8th instructed its "local bonding company" to obtain a bond for Milarr. A part of the twenty-fifth finding of fact was that no reference to the bond was made by Platt in the letter of September 11th, already referred to, in which he offered to pay Milarr a bonus if the latter would resume work on September 14th. In its discussion the court below thus disposed of the contention relative to the failure of Platt to furnish the bond: "There was never any demand by H. Platt Company that Milarr furnish the bond as a condition precedent to continuance of work or to payment for work performed by Milarr. But, in our opinion, it is not necessary to determine whether the bond was waived. H. Platt Company may have had the right, at any time during the progress of the work, to insist upon the bond and to have withheld payment for work done until the bond was furnished. It did not adopt this attitude. The refusal to pay Milarr on September 15th was based squarely upon defendant's claim that it owed Milarr nothing. (In the words of defendant's counsel, 'Cook told Milarr to his face that there was nothing due him'). This conclusion and its announcement, defendant claims, was preceded by its computation of the work performed by Milarr and a conference thereon with the president of the defendant company."

What we have above said disposes of eleven of the thirteen assignments of error. The remaining assignments relate to the admission of certain testimony, but in our opinion they are lacking in merit and do not require discussion. We are all of opinion that this case was properly disposed of in the court below.

Judgment affirmed.